[No. A120462. First Dist., Div. Two. Feb. 10, 2009.]

DIANE BENSON, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and THE
PERMANENTE MEDICAL GROUP, Respondents.

1536

1538

**COUNSEL**

Law Offices of Timothy D. Timmons and Timothy D. Timmons for Petitioner.

Farrell Fraulob & Brown, Cheryl Brown; and William A. Herreras for California Applicants' Attorneys Association as Amicus Curiae on behalf of Petitioner.

No appearance by Respondent Workers' Compensation Appeals Board.

Law Offices of Carl Taber and Carl Taber for Respondent The Permanente Medical Group.

Law Offices of Saul Allweiss and Michael A. Marks for California Workers' Compensation Institute as Amicus Curiae on behalf of Respondent The Permanente Medical Group.

Raymond G. Fortner, Jr., County Counsel, Leah D. Davis, Assistant County Counsel, Derrick M. Au, Principal Deputy County Counsel, Jeffrey L. Scott, Deputy County Counsel, and Lin Lee, Associate County Counsel, as Amici Curiae for Respondents.

Chernow & Lieb and Timothy C. Nelson for Zenith Insurance Co. as Amicus Curiae on behalf of Respondents.

Sedgwick Detert Moran & Arnold, Christina J. Imre and Michael M. Walsh for CalChamber as Amicus Curiae on behalf of Respondents.

## OPINION

**HAERLE, J.**—Diane Benson (Benson) seeks review of the en banc opinion and decision after reconsideration of the Workers' Compensation Appeals Board (Board) that granted her a total of $49,210, in two separate awards, based on a determination that two industrial injuries to her neck each caused 31 percent permanent disability. Benson contends she is entitled to a single award of $67,016.25 because she suffers a combined permanent disability from both injuries of 62 percent. Having previously granted Benson's petition for a writ of review, we now affirm the decision of the Board.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Benson began work as a file clerk for respondent The Permanente Medical Group (Permanente) in April 1992. Benson's job required her to stand essentially all day, except for some brief periods of sitting, and it required repetitive neck and upper extremity motion. On June 3, 2003, she sustained an injury to her neck while reaching up over her head and pulling out a plastic bin to file a chart, at which point she felt a pain in her neck. The next day, she went to work, but her neck hurt even more. She was initially diagnosed with neck strain and put on light duty. On July 15, 2003, Benson was placed on temporary total disability and did not return to work thereafter. In November 2003, she filed an application for adjudication of claim alleging a specific injury on June 3, 2003. Benson eventually underwent a three-level fusion of the cervical spine.

On September 26, 2005, Benson was examined by Joseph Izzo, M.D., who was acting as an agreed medical examiner (AME). In his report, Dr. Izzo concluded that Benson had actually sustained two separate injuries to her neck—the specific injury on June 3, 2003, and a cumulative trauma injury through June 3, 2003. Dr. Izzo also concluded that Benson's injuries both became permanent and stationary on September 26, 2005. Dr. Izzo apportioned half of Benson's permanent disability to cumulative trauma through June 3, 2003, and half to the specific injury of June 3, 2003.[1] Dr. Izzo

---

[1] " 'Apportionment is the process employed . . . to segregate the residuals of an industrial injury from those attributable to other industrial injuries, or to nonindustrial factors, in order to

concluded there was no basis for apportionment to nonindustrial factors. Benson later filed a second claim for the cumulative trauma injury.

It is undisputed that Benson's combined permanent disability rating is 62 percent, after adjustment for age and occupation. At trial before the workers' compensation judge (WCJ), Permanente argued that the 2004 workers' compensation reform legislation, enacted as Senate Bill No. 899 (2003–2004 Reg. Sess.),[2] abrogated *Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491 [138 Cal.Rptr. 696, 564 P.2d 848] (*Wilkinson*) and necessitated two separate awards of 31 percent permanent disability. Benson urged that *Wilkinson* had survived Senate Bill No. 899 and argued for the imposition of a single award based on a combined rating of 62 percent permanent disability. The WCJ issued her findings and award, which applied *Wilkinson* and issued a single award of $67,016.25 based on the combined permanent disability rating.

Permanente filed a petition for reconsideration, which the Board granted. Thereafter, the Board issued an en banc opinion and decision after reconsideration, wherein a majority of the Board held that "the rule in *Wilkinson* is not consistent with the new requirement that apportionment be based on causation and, therefore, *Wilkinson* is no longer generally applicable. Rather, we now must determine and apportion to the cause of disability for each industrial injury."[3] Applying its holding, the Board concluded that "[b]ased upon the AME's determination that each of [Benson's] two injuries was equally responsible for her current level of permanent disability, she is entitled to receive a separate award of 31% permanent disability for each injury." The Board amended the WCJ's findings and award to provide for two

---

fairly allocate the legal responsibility.' [Citation.]" (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1321 [57 Cal.Rptr.3d 644, 156 P.3d 1100] (*Brodie*).)

[2] Hereafter Senate Bill No. 899. In relevant part, Senate Bill No. 899 repealed Labor Code former sections 4663, 4750, and 4750.5 and added new Labor Code sections 4663 and 4664. (Stats. 2004, ch. 34, §§ 33–35, 37–38.)

[3] The majority opinion noted that a single award may still be appropriate in certain circumstances: "We observe, however, that there may be limited circumstances, not present here, where the evaluating physicians cannot parcel out, with reasonable medical probability, the approximate percentages to which each successive injury causally contributed to the employee's overall permanent disability. Under these limited circumstances, a combined award of permanent disability may still be justified." "In such an instance, the physician's apportionment 'determination,' within the meaning of [Labor Code] section 4663, could properly be that the approximate percentages of disability caused by each of the successive injuries cannot reasonably be determined. As a result, the employee would be entitled to an undivided (i.e., joint and several) award for the combined permanent disability, because the respective defendants would have failed in their burdens of proof on the issue of apportionment. (*Kopping v. Workers' Comp. Appeals Bd.* (2006) 142 Cal.App.4th 1099, 1115 [48 Cal.Rptr.3d 618].)"

separate awards of $24,605 each, based on two separate ratings of 31 percent permanent disability. The Board's two awards entitle Benson to a total of $49,210, with each award payable at $185 per week for 133 weeks. The WCJ's combined award entitled Benson to a total of $67,016.25, payable at $185 per week for 362.25 weeks. The difference is caused by the nonlinear benefit schedule, which more generously compensates more severe disabilities. (*Brodie, supra,* 40 Cal.4th at p. 1321 & fn. 5; Lab. Code, § 4658 [number of weeks of indemnity increases in proportion to percentage of permanent disability].)

One commissioner dissented, arguing that Senate Bill No. 899 did not impact *Wilkinson* and, alternatively, that substantial evidence did not support a finding that any permanent disability was caused by Benson's cumulative injury. This petition for a writ of review followed.

## II. DISCUSSION

Benson maintains that the Board erred by (1) holding that the repeal of Labor Code former section 4750 (repealed by Stats. 2004, ch. 34, § 37),[4] and enactment of new sections 4663 and 4664, abrogated the *Wilkinson* doctrine and/or (2) applying sections 4663 and 4664 to require apportionment between two simultaneous industrial injuries.[5] For the reasons discussed below, we conclude that Senate Bill No. 899 superseded the *Wilkinson* doctrine and that current sections 4663 and 4664 require apportionment to each distinct industrial injury causing a permanent disability.[6]

### A. *STANDARD OF REVIEW*

When a workers' compensation decision rests on the Board's erroneous interpretation of the law, the reviewing court will annul the decision. (*Save Mart Stores v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.App.4th 720, 723

---

[4] All further statutory references are to the Labor Code unless otherwise indicated.

[5] We requested and received supplemental briefing from the parties on the latter issue. In addition, the County of Los Angeles, Zenith Insurance Company (Zenith), and the California Chamber of Commerce (CalChamber) each filed amicus curiae briefs in support of Permanente on the latter issue. We also received amicus curiae briefs, on the *Wilkinson* issue, from the California Applicants' Attorneys Association (CAAA) and the California Workers' Compensation Institute (CWCI).

[6] We reject Permanente's contention that Benson has forfeited review by failing to specifically allege a statutory ground for review under section 5952. Permanente's reliance on *In re S.B.* (2004) 32 Cal.4th 1287, 1293, footnote 2 [13 Cal.Rptr.3d 786, 90 P.3d 746], is misplaced. *In re S.B.* held that a mother's failure to object to a juvenile court's visitation order did not bar the appellate court from entertaining her challenge to that order on appeal. (*Id.* at p. 1293.)

[4 Cal.Rptr.2d 597].) The Board's conclusions on questions of law are reviewed de novo. (*Barnes v. Workers' Comp. Appeals Bd.* (2000) 23 Cal.4th 679, 685 [97 Cal.Rptr.2d 638, 2 P.3d 1180]; *Kuykendall v. Workers' Comp. Appeals Bd.* (2000) 79 Cal.App.4th 396, 402 [94 Cal.Rptr.2d 130].) When the reviewing court is asked to interpret and apply a statute to undisputed facts, the review is de novo. (*Wright v. Beverly Fabrics, Inc.* (2002) 95 Cal.App.4th 346, 352 [115 Cal.Rptr.2d 503].)

■ When interpreting a statute, the reviewing court's purpose is to effectuate the Legislature's intent. (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) "In construing a statute, [the court's] first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, [the court should] look no further and simply enforce the statute according to its terms. [Citations.]" (*Id.* at pp. 387–388.) " ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' " (*Id.* at p. 388.)

■ If the statutory language is susceptible of more than one reasonable interpretation, the courts look to "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) "In interpreting the workers' compensation statutes, [the court] give[s] great weight to the construction of the [Board], unless it is clearly erroneous or unauthorized. [Citation.]" (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 34 [24 Cal.Rptr.3d 179, 105 P.3d 544]; accord, *Brodie, supra,* 40 Cal.4th at p. 1331.) On the other hand, the workers' compensation statutes "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (§ 3202.)

### B. *INDUSTRIAL INJURY AND PERMANENT DISABILITY*

■ Section 3208 defines "injury" as "any injury or disease arising out of the employment . . . ." Under section 3208.1 "[a]n injury may be either: (a) 'specific,' occurring as the result of one incident or exposure which causes

disability or need for medical treatment; or (b) 'cumulative,' occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability or need for medical treatment. The date of a cumulative injury shall be the date determined under Section 5412." "[A] compensable injury is one which causes disability or need for medical treatments." (*Coca-Cola Bottling Co. v. Superior Court* (1991) 233 Cal.App.3d 1273, 1284 [285 Cal.Rptr. 183, 286 Cal.Rptr. 855].)

■ The Labor Code does not define "permanent disability." However, " '[p]ermanent disability is understood as "the irreversible residual of an injury." ' [Citation.]" (*Brodie, supra*, 40 Cal.4th at p. 1320.) "[P]ermanent disability payments are intended to compensate workers for both physical loss and the loss of some or all of their future earning capacity. [Citations.]" (*Ibid.*) The administrative regulations provide: "A disability is considered permanent when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 10152; accord, *Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1292 [135 Cal.Rptr.2d 665, 70 P.3d 1076] [" '[T]he right to permanent disability compensation does not arise until the injured worker's condition becomes "permanent and stationary." ' "].) " 'The individual physical and mental abnormalities resulting from injury are referred to as "factors" of permanent disability. The individual factors taken together constitute the entire permanent disability.' (Cal. Workmen's Compensation Practice (Cont.Ed.Bar) § 17.13, pp. 537–538.)" (*Hegglin v. Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162, 171 [93 Cal.Rptr. 15, 480 P.2d 967].)

### C. *THE BOARD WAS CORRECT IN CONCLUDING THAT* WILKINSON *WAS ABROGATED BY SENATE BILL NO. 899*

■ The California Constitution confirms the Legislature's "plenary power . . . to create, and enforce a complete system of workers' compensation, by appropriate legislation . . . ." (Cal. Const., art. XIV, § 4.) In 2004, the Legislature exercised that power by enacting omnibus reform of the workers' compensation statutes. (*Brodie, supra*, 40 Cal.4th at p. 1323.) Senate Bill No. 899 was "an urgency measure designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie, supra*, 40 Cal.4th at p. 1329; accord, Stats. 2004, ch. 34, § 49.) The question presented is whether the *Wilkinson* doctrine remains controlling despite the Legislature's enactment of Senate Bill No. 899. We start by examining apportionment law as it existed before Senate Bill No. 899 and then turn to the new statutory scheme.

*Apportionment Law Before Senate Bill No. 899*

Before the enactment of Senate Bill No. 899, apportionment was governed by former sections 4663,[7] 4750,[8] and 4750.5.[9] (*Marsh v. Workers' Comp. Appeals Bd.* (2005) 130 Cal.App.4th 906, 911–912 [30 Cal.Rptr.3d 598] (*Marsh*).) " 'Two sections, 4750 and 4663, appl[ied] to antecedent injuries. [Former] [s]ection 4750 relieve[d] an employer from the burden of compensating an injured worker for disability attributable to a preexisting permanent disability or physical impairment. [Former] [s]ection 4663 [did] the same when an injured worker's disability [was] partially attributable to a preexisting disease or condition.' " (*Marsh, supra,* 130 Cal.App.4th at pp. 911–912.) Former section 4663 "left employers liable for any portion of a disability that would not have occurred but for the current industrial cause; if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause would not alone have given rise to a disability, no apportionment was to be allowed. [Citations.]" (*Brodie, supra,* 40 Cal.4th at p. 1326.) "[F]ormer section 4750 was interpreted as granting employees wide latitude to disprove apportionment based on prior permanent disability awards by demonstrating that they had substantially rehabilitated the injury. [Citation.]" (*Brodie, supra,* 40 Cal.4th at pp. 1326–1327.) Thus, "[b]efore the enactment of Sen. Bill 899, apportionment was 'concerned with the disability, not its cause or pathology.' [Citation.]" (*Marsh, supra,* 130 Cal.App.4th at p. 912; accord, *Brodie, supra,* 40 Cal.4th at p. 1326 [under old apportionment rules "courts properly rejected apportionment of a single disability with multiple causes"].)

In *Wilkinson,* our Supreme Court interpreted former section 4750 and held that "whenever a worker . . . sustains successive injuries to the same part of his body and these injuries become permanent at the same time, the worker is entitled to an award based on the combined disability." (*Wilkinson, supra,* 19

---

[7] Former section 4663 (repealed by Stats. 2004, ch. 34, § 33) provided: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributed to the injury."

[8] Former section 4750 (repealed by Stats. 2004, ch. 34, § 37) provided: "An employee who is suffering from a *previous permanent disability* or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the *previous disability* or impairment. [¶] The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed." (Italics added.)

[9] Former section 4750.5 (repealed by Stats. 2004, ch. 34, § 38) provided, in relevant part: "An employee who has sustained a compensable injury and who subsequently sustains an unrelated noncompensable injury, shall not receive permanent disability indemnity for any permanent disability caused solely by the subsequent noncompensable injury."

Cal.3d at p. 494, citing *Bauer v. County of Los Angeles* (1969) 34 Cal.Comp.Cases 594.) In *Wilkinson*, the employee had injured both of his knees—first, in a fall on April 15, 1972, and then again on June 30, 1972. (19 Cal.3d at p. 494.) It was determined that both injuries arose out of and occurred in the course of employment and that both injuries became permanent at the same time. (*Id.* at pp. 494–495.) After deducting preexisting disability caused by nonindustrial injuries, the WCJ apportioned the combined remaining permanent disability of 30.5 percent between the two industrial injuries, rating each at 15.25 percent. (*Id.* at p. 495.) The WCJ awarded $3,587.50 for each injury, or a total of $7,175. (*Ibid.*)

Wilkinson sought reconsideration, arguing his entitlement to a total award of $8,662.50, based on a combined permanent disability rating of 30.5 percent for both injuries. (*Wilkinson, supra,* 19 Cal.3d at p. 496.) The Board upheld the WCJ's separate awards in reliance on former section 4750. (19 Cal.3d at p. 496.) Our Supreme Court disagreed, reasoning that former section 4750 did "not require apportionment in all cases of successive injuries, but only in cases of successive permanent disabilities. If the worker incurs successive injuries which become permanent *at the same time*, neither permanent disability is 'previous' to the other, and section 4750 hence does not require apportionment." (19 Cal.3d at p. 497.) The court noted that this understanding "also serves the practical purpose of avoiding the necessity for apportioning disability in a class of cases in which, because of the nature and timing of the injuries, any apportionment is likely to be unsupported by substantial evidence." (*Ibid.*) Thus, the court held that "the board erred in apportioning Wilkinson's permanent disability between the injuries of April 15, and June 30, 1972" and remanded with instructions to award benefits based on a combined permanent disability of 30.5 percent. (*Id.* at p. 502.)

### The Board's Decision

In this case, the Board concluded, at Permanente's urging, that the Legislature's repeal of former section 4750 and enactment of new sections 4663 and 4664 revealed its plain intent to adopt a new apportionment scheme inconsistent with the *Wilkinson* doctrine. The Board's decision, and Permanente's argument before us, relies in large part on the plain language of new sections 4663 and 4664. Section 4664, subdivision (a), provides: "The employer shall only be liable for the percentage of permanent disability directly caused by the injury arising out of and occurring in the course of employment."[10] Section 4663 provides, in relevant part, as follows:

---

[10] Section 4664, subdivision (b), provides: "If the applicant has received a prior award of permanent disability, it shall be conclusively presumed that the prior permanent disability exists at the time of any subsequent industrial injury. This presumption is a presumption affecting the burden of proof." The Third Appellate District has construed this provision to mean that

"(a) Apportionment of permanent disability shall be based on causation.

"(b) Any physician who prepares a report addressing the issue of permanent disability due to a claimed industrial injury shall in that report address the issue of causation of the permanent disability.

"(c) In order for a physician's report to be considered complete on the issue of permanent disability, the report must include an apportionment determination. A physician shall make an apportionment determination by finding what approximate percentage of the permanent disability was caused by the direct result of injury arising out of and occurring in the course of employment and what approximate percentage of the permanent disability was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries. If the physician is unable to include an apportionment determination in his or her report, the physician shall state the specific reasons why the physician could not make a determination of the effect of that prior condition on the permanent disability arising from the injury. The physician shall then consult with other physicians or refer the employee to another physician from whom the employee is authorized to seek treatment or evaluation in accordance with this division in order to make the final determination.

"(d) An employee who claims an industrial injury shall, upon request, disclose all previous permanent disabilities or physical impairments."

The Board also relied on *Brodie, supra*, 40 Cal.4th 1313. In *Brodie*, the Supreme Court considered the impact of Senate Bill No. 899 on the following question: "When a worker suffers an industrial injury that results in permanent disability, how should the compensation owed based on the current level of permanent disability be discounted for either previous industrial injury or nonindustrial disabilities?"[11] (*Brodie*, at p. 1317.) In *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1 [128 Cal.Rptr. 673, 547 P.2d 449]

once a permanent disability award has been made, the permanent disability so compensated will be conclusively presumed to exist and be subject to apportionment, unless the employer fails to prove overlap between the previous permanent disability and the new permanent disability caused by a subsequent industrial injury. (*Kopping v. Workers' Comp. Appeals Bd., supra*, 142 Cal.App.4th at p. 1114.) Thus, section 4664, subdivision (b), "was intended to reverse the rule based on former section 4750 that permitted an injured employee to show rehabilitation of an injury for which a permanent disability award had already been issued [citations]." (*Brodie, supra*, 40 Cal.4th at p. 1327.)

[11] In *Brodie*, the permanent disability level for each injured worker could be partially attributed to either (a) a prior industrial injury *that had resulted in a prior permanent disability award*; or (b) nonindustrial causes. (*Brodie, supra*, 40 Cal.4th at pp. 1318–1319.) In *Brodie*, no one argued, as Permanente does here, that apportionment was required when multiple industrial injuries had been suffered but no permanent disability previously awarded. (*Ibid.*)

(*Fuentes*), the court had previously held that "formula A" was the correct method for calculating an award when permanent disability could be partially attributed to nonindustrial causes. (*Brodie, supra*, 40 Cal.4th at pp. 1322–1323 [noting "formula A" also applied when permanent disability could be partially attributed to a previous permanent disability].) Under "formula A," the percentage of permanent disability attributable to a new injury is calculated by subtracting the old permanent disability rating from the new permanent disability rating and then consulting the benefits table for the award due that difference. (*Brodie, supra*, 40 Cal.4th at pp. 1321–1322; *Fuentes, supra*, 16 Cal.3d at p. 5.)

After reviewing the prior approach to apportionment, the *Brodie* court attributed the 2004 statutory revisions to the following goals: (1) reversal of the rule barring apportionment "if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause would not alone have given rise to a disability" and (2) reversal of the rule allowing "employees wide latitude to disprove apportionment based on prior permanent disability awards by demonstrating that they had substantially rehabilitated the injury. [Citation.]"[12] (*Brodie, supra*, 40 Cal.4th at pp. 1326–1327.) The *Brodie* court reasoned that former sections 4663 and 4750, "as interpreted by the courts, were inconsistent with the new regime of apportionment based on causation, as well as the conclusive presumption that previous permanent disability still existed for apportionment purposes. (§§ 4663, subd. (a), 4664, subds. (a), (b).) Former section 4750 required consideration of the new injury 'by itself and not in conjunction with or in relation to the previous disability or impairment' and further called for compensation for the later injury to be determined 'as though no prior disability or impairment had existed.' But under Senate Bill No. 899 . . . , the new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source. This approach requires thorough consideration of past injuries, not disregard of them. Thus, repeal of section 4750 was necessary to effect the Legislature's purposes in adopting a causation regime." (*Brodie, supra*, 40 Cal.4th at pp. 1327–1328, fn. omitted.)

The court observed: " '[w]e do not presume that the Legislature intends . . . to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.' [Citations.]" (*Brodie, supra*, 40 Cal.4th at p. 1325.) Given that the legislative goals just noted sufficiently

---

[12] We do not read this statement of legislative intent as determinative of the question presented here. (See *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613] ["An opinion is not authority for propositions not considered."].)

explained the reforms, the absence of legislative history regarding calculation, and that the plain language of the new statutes did not compel any particular method of calculation, the Supreme Court held that Senate Bill No. 899 had not superseded *Fuentes*. (*Brodie, supra*, 40 Cal.4th at pp. 1325–1332.)

■ Benson analogizes to *Brodie* and maintains that neither the plain language of the new apportionment scheme, nor its legislative history, suggests that the Legislature sought to abrogate the 30-year-old *Wilkinson* decision. We disagree and conclude that the plain language of the new statutory scheme requires apportionment to each cause of a permanent disability, including each distinct industrial injury. This conclusion is compelled by (1) the plain language of current sections 4663 and 4664; (2) the repeal of former section 4750; (3) the legislative history; and (4) the deference we owe the Board's interpretation of workers' compensation statutes. (*Honeywell v. Workers' Comp. Appeals Bd., supra*, 35 Cal.4th at p. 34.) We address each point in turn.

### (1) *The Plain Language of Sections 4663 and 4664*

Sections 4663 and 4664 do not support Benson's argument that the Legislature only intended to protect employers from liability for permanent disability previously compensated or not caused by their employment. In fact, the plain language of sections 4663 and 4664 compels apportionment here.

Section 4664, subdivision (a), provides: "The employer shall only be liable for the percentage of permanent disability directly caused by *the injury* arising out of and occurring in the course of employment." (Italics added.) The Legislature's use of the phrase "the injury" necessarily implies that each distinct industrial injury must be separately compensated. Adopting Benson's interpretation would ignore the Legislature's use of the singular form of "injury," rather than the plural. Although all 62 percent of Benson's permanent disability was directly caused by *injuries* arising out of and occurring in the course of Benson's employment with Permanente, each distinct industrial *injury* directly caused only half of that permanent disability.

Furthermore, section 4663, subdivision (a), provides that "[a]pportionment of permanent disability shall be based on causation." The plain language of section 4663, subdivision (a), makes clear that the focus is no longer on the permanent disability itself, but *its causes*. "Apportionment . . . based on causation" is not naturally limited to apportionment to nonindustrial causes and previous permanent disability awards. Rather, "[a]pportionment . . . based on causation" must mean apportionment to all causes, including each distinct industrial injury. Had the Legislature intended to insulate certain causes from apportionment, it would have said so.

Our understanding is confirmed by the plain language of section 4663, subdivision (c), which calls for a physician to make an apportionment determination "by finding what approximate percentage of the permanent disability *was caused by the direct result of injury arising out of and occurring in the course of employment* and what approximate percentage of the permanent disability *was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries.*" (Italics added.) Again, the Legislature required assessment of the approximate percentage of permanent disability "caused by the direct result of *injury*" and not injuries. (§ 4663, subd. (c), italics added.) We agree with the Board majority that the plain language of section 4663, subdivision (c), read in conjunction with the rest of the statutory scheme, suggests the Legislature's intent to require apportionment on an injury-by-injury basis, and no longer only for "previous permanent disability."[13] (Compare § 4663, subd. (c) with former § 4750.) Although *Brodie* did not address the precise question presented here, the *Brodie* court's interpretation of Senate Bill No. 899 is consistent with the Board majority's understanding. (See *Brodie, supra,* 40 Cal.4th at p. 1328 ["the new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source"].)

The clear change in the statutory language indicates an intent to invalidate *Wilkinson.* (See *Mosk v. Superior Court* (1979) 25 Cal.3d 474, 493 [159 Cal.Rptr. 494, 601 P.2d 1030] ["Generally, a substantial change in the language of a statute or constitutional provision by an amendment indicates an intention to change its meaning."]; *Brodie, supra,* 40 Cal.4th at p. 1332.) Reference to other subdivisions of sections 4663 and 4664 makes clear that the Legislature was cognizant of the distinction between successive permanent disabilities and successive injuries. (See § 4663, subd. (d) ["An employee who claims an industrial injury shall, upon request, disclose all *previous permanent disabilities* or physical impairments." (Italics added.)]; § 4664, subd. (b) ["If the applicant has received a *prior award of permanent disability*, it shall be conclusively presumed that the *prior permanent disability* exists at the time of any subsequent industrial injury." (Italics added.)].) The Legislature's focus, in section 4663, subdivision (c), on apportionment to other causative factors, "including prior industrial injuries," rather than prior permanent disabilities, must be accorded significance.[14]

---

[13] Benson concedes that section 4663, subdivision (c), not only governs the physician's analysis, but also the Board's own apportionment determination.

[14] The Third District Court of Appeal, in *Kopping v. Workers' Comp. Appeals Bd., supra,* 142 Cal.App.4th 1099, suggested a similar interpretation of section 4663, subdivision (c). In *Kopping,* the injured worker argued: " '[i]f the Legislature intended [section 4664, subdivision (b)] to create a conclusive presumption requiring deduction of prior awards by operation

It is unreasonable to contend, as Benson does, that the plain language of section 4663, subdivision (c), is consistent with the continued validity of *Wilkinson*.[15] The dissenting commissioner below similarly contended that "section 4663, subdivision (c), provides for the apportionment of disability to 'other factors *both before and subsequent* to the industrial injury' (emphasis added), but it does not provide for the apportionment of disability to causation by 'other factors' where those factors are caused by successive industrial injuries and are *concurrent with* the factors of disability caused by the first industrial injury. . . . That is, to rephrase *Wilkinson*: if the worker incurs successive injuries which become permanent at the same time, none of the factors causing permanent disability is 'before or subsequent' to the others, and section 4663 hence does not require apportionment."

The problem with the dissenting commissioner's approach is that it rewrites the statute to require apportionment based on "what approximate

of law, what would be the purpose of requiring physicians to calculate the percentage of current permanent disability caused by prior industrial injuries?' " (*Id.* at p. 1112.) The court responded: "One answer to that question is that section 4664(b) creates a presumption arising from 'a prior award of permanent disability,' not from a prior industrial injury. It is possible that an applicant may have had a prior industrial injury, *but never applied for or received an award of permanent disability* resulting from that injury. In such a case, in the event of a subsequent industrial injury, the presumption of section 4664(b) would have no effect, but a physician could still determine, as a matter of fact, that the applicant's present level of permanent disability was partially caused by the previous industrial injury." (*Ibid.*, italics added.)

[15] Nor can we agree with CAAA that the Board's interpretation of Senate Bill No. 899 creates a speculative evidentiary standard. According to CAAA, "[i]f the injuries are such that the medical status of the injured worker is not stabilized in connection with each injury, it is impossible for a medical expert or trier of fact to determine the effect of one injury on another when the medical condition is fluid." (See *Wilkinson, supra,* 19 Cal.3d at p. 499 ["the interaction between the injuries may make apportionment of disability impossible or inequitable"].) CAAA's argument is better addressed to the Legislature. Section 4663, subdivision (c), provides, in part: "A physician *shall* make an apportionment determination by finding what approximate percentage of the permanent disability was caused by the direct result of injury arising out of and occurring in the course of employment and what approximate percentage of the permanent disability was caused by other factors . . . including *prior industrial injuries.*" (Italics added.) The Legislature also explicitly provided that "[i]f the physician is unable to include an apportionment determination in his or her report, the physician shall state the specific reasons why the physician could not make a determination of the effect of that prior condition on the permanent disability arising from the injury. The physician shall then consult with other physicians or refer the employee to another physician from whom the employee is authorized to seek treatment or evaluation in accordance with this division in order to make the final determination." (§ 4663, subd. (c).) Here, Dr. Izzo apparently had no difficulty in making an apportionment determination and did, in fact, apportion Benson's permanent disability between her two distinct industrial injuries. Benson does not argue that Dr. Izzo's opinion is speculative and we decline to address CAAA's argument to that effect. Because this argument was not raised by Benson in her petition, but only by amicus curiae, it is not properly before us. (*Pratt v. Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 143 [39 Cal.Rptr. 332].)

percentage of the permanent disability was caused by other factors both before and subsequent to [the permanent disability caused by] the industrial injury . . . ." (§ 4663, subd. (c).) In so doing, the dissent assumes that section 4663, subdivision (c), was intended to perpetuate the preexisting permanent disability rule. However, Senate Bill No. 899 could not have been intended to eliminate the "but for rule" with respect to permanent disability simultaneously caused by industrial and *nonindustrial* factors while, at the same time, perpetuating the preexisting disability rule for industrial injuries. (See *Brodie, supra*, 40 Cal.4th at pp. 1326–1327, 1331 ["In cases of apportionment for causation, however, the notion of a 'first' 30 percent and a 'second' 30 percent will frequently not apply. Where an industrial cause and nonindustrial cause simultaneously interact and are equally responsible for a 60 percent injury, there is no first 30 percent or second 30 percent."]; *E.L. Yeager Construction v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 922, 929 [52 Cal.Rptr.3d 133] ["prior disability or evidence of modified work performance is no longer a prerequisite to apportionment"].) In order for the Board to comply with section 4664, subdivision (a), and distinguish permanent disability directly caused by the industrial injury from permanent disability *simultaneously* caused by nonindustrial factors, medical evidence, determining the percentages attributable to each, must be available. (See *Brodie, supra*, 40 Cal.4th at pp. 1327, 1331.) Benson's interpretation of section 4663, subdivision (c), would deprive the Board of a physician's apportionment determination when permanent disability is simultaneously caused by multiple factors, industrial or otherwise.

In conclusion, we agree with the Board majority that the plain language of section 4663, subdivision (c), read in conjunction with the statutory scheme as a whole, "specifically requires a physician to determine what percentage of disability *was caused by each industrial injury*, regardless of whether any particular industrial injury occurred before or after any other particular industrial injury or injuries." Given the plain language of the new statutory provisions, we agree with the Board that "[a]pplication of *Wilkinson*, and the concomitant merging of separate injuries into a single award of disability, is contrary to the reforms set in place by SB 899, which mandate that an employer cannot be held liable for any disability other than that directly caused by the industrial injury."

### (2) *Repeal of Former Section 4750*

The repeal of former section 4750 buttresses our conclusion. (See *Wilkinson, supra*, 19 Cal.3d at p. 497 [former § 4750 "d[id] not require apportionment in all cases of successive injuries, but only in cases of successive permanent disabilities"].) As the Supreme Court stated in *Brodie*: "the new approach to apportionment is to look at the current disability and

parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source. This approach requires thorough consideration of past injuries, not disregard of them. Thus, repeal of section 4750 was necessary to effect the Legislature's purposes in adopting a causation regime." (*Brodie, supra,* 40 Cal.4th at p. 1328.)

■ Nonetheless, Benson urges us to follow the presumption, reiterated by the *Brodie* court, that the Legislature does not intend " 'to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.' " (*Brodie, supra,* 40 Cal.4th at p. 1325.) According to Benson, we should be even more cautious than the *Brodie* court in inferring intent to supersede long-standing precedent from the repeal of former section 4750, because *Wilkinson* was an exception to the *Fuentes* doctrine. (*Wilkinson, supra,* 19 Cal.3d at p. 500 ["[O]ur decision in *Fuentes* explaining how to apportion disability for injuries falling *within* section 4750 is inapplicable to [the successive industrial injuries at issue here] which do *not* fall within the scope of that section."].) Therefore, if the Legislature, by repealing former section 4750, did not intend to abrogate *Fuentes,* in which the result was mandated by the express language of former section 4750 (*Fuentes, supra,* 16 Cal.3d at p. 6), then surely it did not intend to abrogate Supreme Court precedent that provided an exception predicated on the same statute.

*Brodie* is distinguishable. In *Brodie,* the Supreme Court concluded that, with respect to *Fuentes,* "nothing in current section 4663 or section 4664 expressly requires formulas A, B, C, modified C, or any other approach to calculating compensation. Nor does anything in the language implicitly do so." (*Brodie, supra,* 40 Cal.4th at p. 1325.) With respect to apportionment, however, we agree with the Board that "the Legislature has not been silent." As amicus curiae CWCI contends: *"The permanent and stationary date of successive injuries is* [now] *irrelevant, because the requirement of a preexisting disability to support apportionment no longer exists."* The Legislature rejected the combination of distinct industrial injuries when it repealed former section 4750 and enacted sections 4663 and 4664. Accordingly, any presumption in favor of the continued validity of *Wilkinson* does not apply. (*Brodie, supra,* 40 Cal.4th at p. 1325.)

(3) *Legislative History*

"When the [statutory] language is clear and there is no uncertainty as to the legislative intent, we [are required to] look no further and simply enforce the statute according to its terms. [Citations.]" (*DuBois v. Workers' Comp. Appeals Bd., supra,* 5 Cal.4th at pp. 387–388.) Inasmuch as the plain language of the new apportionment scheme expresses a legislative intent to abrogate the

*Wilkinson* doctrine, we are required to go no further. But even if some ambiguity were to exist in the statutory language, our conclusion is reinforced by the legislative history.[16]

Senate Bill No. 899 itself provides: "This act is an *urgency statute* necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are: [¶] In order to *provide relief to the state from the effects of the current workers' compensation crisis* at the earliest possible time, it is necessary for this act to take effect immediately." (Stats. 2004, ch. 34, § 49, italics added.) The perceived crisis that the Legislature sought to relieve was one caused by soaring workers' compensation costs. (See Stats. 2004, ch. 34, § 49; Assem. Com. on Insurance, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, p. 3 [identifying "crisis" linked to "skyrocketing costs"]; Cal. Chamber of Commerce, Floor Alert regarding Sen. Bill No. 899 (2003–2004 Reg. Sess.) Apr. 15, 2004 ["[w]orkers' compensation costs for employers have skyrocketed 136% over the past four years, on average"].)

We cannot agree with Benson that the Legislature's sole intent was to combat rising premium rates caused by disturbances within the insurance sector. (See Assem. Com. on Insurance, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, pp. 3–4 [attributing increased insurance premium rates to deregulation and investment losses in the insurance sector, as well as increasing costs of medical care].) Workers' compensation costs "ha[d] increased for a number of reasons."

---

[16] Amicus curiae County of Los Angeles filed a request seeking judicial notice of: (1) a conference report of the Senate Rules Committee on Senate Bill No. 899; (2) a press release from the office of Governor Arnold Schwarzenegger after passage of Senate Bill No. 899; (3) an article written by David Neumark, for the Public Policy Institute of California, entitled *The Workers' Compensation Crisis in California* (Jan. 2005) California Economic Policy, page 1; and (4) minutes from the February 24, 2005, meeting of the Commission on Health and Safety and Workers' Compensation. Benson opposes the County of Los Angeles's request. We grant the County of Los Angeles's request for judicial notice with respect to item (1) above. "[I]t is well established that reports of legislative committees and commissions are part of a statute's legislative history and may be considered when the meaning of a statute is uncertain. [Citations.]" (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326]; accord, *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31–32 [34 Cal.Rptr.3d 520] (*Kaufman*).) However, we deny the County of Los Angeles's request for judicial notice with respect to items (2), (3), and (4) above. In construing a statute, "the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation. [Citations.]" (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057] (*Quintano*).) Because there is no indication that the Legislature considered items (2), (3), or (4), they are not proper subjects of judicial notice. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 168, fn. 2 [96 Cal.Rptr.2d 518, 999 P.2d 706]; *Quintano, supra*, 11 Cal.4th at p. 1062, fn. 5; *Kaufman, supra*, 133 Cal.App.4th at pp. 38, 42.)

(*Id.* at p. 3.) As discussed below, the Legislature repeatedly indicated its specific intent to reform apportionment rules to meet the overarching legislative goal of cost reduction.

As noted by the *Brodie* court, "Senate Bill No. 899 (2003–2004 Reg. Sess.) started out as a minor bill designed to change one aspect of workers' compensation wholly unrelated to apportionment. (See Sen. Com. on Labor and Industrial Relations, Analysis of Senate Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 21, 2003.) It was but one of 20 different bills to reform workers' compensation passed out of the Senate or Assembly in 2003. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended July 14, 2003, pp. 2–3.) Senate and Assembly leaders responded to this plethora of overlapping measures by submitting them to a joint conference to digest the bills and incorporate their provisions into a single omnibus reform measure. (Assem. Com. on Insurance, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, p. 6.)" (*Brodie, supra,* 40 Cal.4th at p. 1329, fn. 12.)

During the 2003–2004 regular legislative session, apportionment reform was originally proposed in Assembly Bill No. 1481, Assembly Bill No. 1579, and Senate Bill No. 714. But these bills proposed reforms that differ significantly from the reforms ultimately enacted. (See Stats. 2004, ch. 34, §§ 33–35, 37–38; Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 21, 2003, pp. 3–4; Sen. Amend. to Sen. Bill No. 714 (2003–2004 Reg. Sess.) Apr. 21, 2003, p. 2; Sen. Amend. to Assem. Bill No. 1579 (2003–2004 Reg. Sess.) July 2, 2003, pp. 60–61.) For example, Assembly Bill No. 1481 proposed, in relevant part: "Section 5705.1 [be] added to the Labor Code, to read: [¶] 5705.1. (a) The burden of proof for the apportionment regarding permanent disability *under Sections 4663, 4750, and 4750.5* shall rest upon the defendant. In accordance with Section 3202.5, the defendant shall demonstrate by a preponderance of the evidence, and by reasonable medical probability, that absent the industrial injury, the injured worker had lost, as a consequence of a preexisting injury or illness, some capacity to perform the activity affected by the injury. [¶] (b) Notwithstanding any other provision of this code relating to workers' compensation benefits, including Section 4062.9, in denying apportionment the appeals board may not, in determining permanent disability, rely on any medical report that fails to fully address the issue of apportionment and fails to set forth the basis of the medical opinion. In denying apportionment, the appeals board may not rely on any medical report that fails to apportion *a previous injury or illness that has been the subject of a prior claim for damages* or that fails to provide a discussion of the medical processes by which a previously asserted injury or illness resolved without affecting bodily function." (Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 21, 2003, pp. 3–4, italics added;

accord, Sen. Amend. to Sen. Bill No. 714 (2003–2004 Reg. Sess.) Apr. 21, 2003, p. 2; Sen. Amend. to Assem. Bill No. 1579 (2003–2004 Reg. Sess.) July 2, 2003, pp. 60–61.)

It was when Senate Bill No. 899 emerged from the conference committee that the proposed apportionment provisions first appeared in the current form. (Proposed Conf. Rep. No. 1 to Sen. Bill No. 899 (2003–2004 Reg. Sess.), as proposed Apr. 15, 2004, pp. 88–89, 91.) Although the legislative history does not provide any further clarification for the changes, we must conclude that the changes had significance. None of the precursor bills had proposed repeal of former sections 4663 and 4750. (See Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 21, 2003; Sen. Amend. to Sen. Bill No. 714 (2003–2004 Reg. Sess.) Apr. 21, 2003; Sen. Amend. to Assem. Bill No. 1579 (2003–2004 Reg. Sess.) July 2, 2003.) Furthermore, all of these precursor bills proposed limiting the Board's reliance "on any medical report that fails to apportion *a previous injury or illness that has been the subject of a prior claim for damages . . . .*" (Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 21, 2003, pp. 3–4, italics added; accord, Sen. Amend. to Sen. Bill No. 714 (2003–2004 Reg. Sess.) Apr. 21, 2003, p. 2; Sen. Amend. to Assem. Bill No. 1579 (2003–2004 Reg. Sess.) July 2, 2003, p. 60.) By removing this limitation and requiring physicians to apportion to "prior industrial injuries" without limitation, it can be inferred that the Legislature intended to expand the scope of apportionment to include prior industrial injuries that had *not* been the subject of prior compensation. (Compare Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 21, 2003, pp. 3–4 with § 4663, subd. (c).) Had the Legislature intended apportionment only for prior industrial injuries that had been the subject of previous awards, it would not have changed the proposed statutory language.

The legislative history also demonstrates a clear intent to wipe the slate clean of prior apportionment law and proceed under an entirely new causation regime. (See Legis. Counsel's Dig., Sen. Bill No. 899 (2003–2004 Reg. Sess.) Stats. 2004, ch. 34, Summary Dig., p. 7 ["This bill would repeal and recast [apportionment] provisions."]; Sen. Rules Com., Off. of Senate Floor Analyses, Conf. Rep. No. 1 on Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 15, 2004, p. 7 ["17. Present law replaced by language that apportionment of permanent disability is based on causation."].) As the Supreme Court has stated, the legislative history of Senate Bill No. 899 "highlights the Legislature's intent to change how one *arrives* at the percentage disability for which an employer or insurer is liable . . . ." (*Brodie, supra,* 40 Cal.4th at p. 1329.)

We cannot conceive that the Legislature would intend to "replace" or "repeal and recast" the rules of apportionment but still retain the *Wilkinson*

doctrine. The Legislature indicated no such exception in either the legislative history or the statutory language. Furthermore, we are not convinced that the absence of reference to *Wilkinson* by name in either the statutory language or the legislative history compels its survival. The Legislature may have on occasion explicitly mentioned certain judicial decisions it sought to overrule. (See, e.g., former § 4750.5 ["The purpose of this section is to overrule the decision in *Jensen v. WCAB* [(1982)] 136 Cal.App.3d 1042 [186 Cal.Rptr. 570]." (Italics added, underscoring omitted.)].) But Benson cites no legal authority compelling the Legislature to do so. In fact, when the Legislature undertakes to amend a statute which has been the subject of judicial construction "it is presumed that the Legislature was fully cognizant of such construction, and when substantial changes are made in the statutory language it is usually inferred that the lawmakers intended to alter the law in those particulars affected by such changes. [Citations.]" (*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155]; see also *People v. Mendoza* (2000) 23 Cal.4th 896, 916 [98 Cal.Rptr.2d 431, 4 P.3d 265] [Legislature's repeal of prior statute "together with its enactment of a new statute on the same subject . . . with significant differences in language, strongly suggests the Legislature intended to change the law"].) When the Legislature repealed former section 4750 and provided for apportionment to causative factors, "including prior industrial injuries," it demonstrated a clear intent to overrule *Wilkinson*. (See § 4663, subd. (c).)

In enacting Senate Bill No. 899, the Legislature made approximately 45 revisions to the workers' compensation statutes. (Stats. 2004, ch. 34, §§ 1–45.) It is little wonder that the Legislature did not mention *Wilkinson* by name in the midst of such extensive reform. Furthermore, it is undisputed that sections 4663 and 4664 abrogated the rehabilitation rule and the bar against apportionment to pathology. (*Brodie, supra,* 40 Cal.4th at pp. 1326–1327.) Yet, the Legislature did not refer to the judicial decisions that had established those long-standing rules. If the Legislature can abrogate those lines of authority without explicit reference, then surely it can do the same regarding *Wilkinson*.

The fact that both workers and employers were to benefit from Senate Bill No. 899 as a whole does not help us interpret the specific statutes at issue here. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended July 14, 2003, pp. 1–2 ["While there is agreement among the parties that the system is in need of repair, what remains subject for debate is what the real systemic problems are and how best to address them without diminishing the arguably meager benefits injured workers receive in this state."].) Benson's reliance on the few provisions of Senate Bill No. 899 that expanded employee benefits is misplaced. (§§ 4658, subd. (d)(1) [increasing benefits for workers with 70

percent or greater permanent disability], 4658, subd. (d)(2) [increasing benefits for disabled workers denied prompt return to work], 5402, subd. (c) [providing additional medical benefits].) The *Brodie* court aptly observed that these changes were all made in areas other than apportionment. (*Brodie, supra,* 40 Cal.4th at p. 1330, fn. 13.)

Benson does not cite any legislative history that both specifically relates to apportionment and supports her position. When it came to apportionment, the Legislature "included a requirement that doctors include apportionment discussions in their reports (§ 4663, subds. (b), (c)), a prohibition against avoiding apportionment by proving that a prior injury had been rehabilitated (§ 4664, subd. (b)), a cap on awards based on injuries to any one body part (§ 4664, subd. (c)(1)), and a reversal of the case-law-imposed prohibition against apportionment based on cause and corresponding expansion of the range of bases that would trigger apportionment (§ 4663, subd. (a))." (*Brodie, supra,* 40 Cal.4th at p. 1330, fn. 13.) Even if the statutory language were ambiguous, the legislative history shows a clear intent to abrogate the *Wilkinson* doctrine.

### (4) *Deference to the Board's Interpretation*

■ Finally, our conclusions are consistent with the en banc Board's well-reasoned majority opinion. "[T]he Board has extensive expertise in interpreting and applying the workers' compensation scheme. Consequently, we give weight to its interpretations of workers' compensation statutes unless they are clearly erroneous or unauthorized. [Citations.]" (*Brodie, supra,* 40 Cal.4th at p. 1331.) The Board's conclusion, that Senate Bill No. 899 superseded the *Wilkinson* doctrine, is not clearly erroneous and is entitled to deference.

■ We are well aware that section 3202 provides that the workers' compensation statutes "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." However, "[s]ection 3202 is a tool for resolving statutory ambiguity where it is not possible through other means to discern the Legislature's actual intent." (*Brodie, supra,* 40 Cal.4th at p. 1332.) Section 3202 " 'cannot supplant the intent of the Legislature as expressed in a particular statute.' (*Fuentes v. Workers' Comp. Appeals Bd.*[, *supra*,] 16 Cal.3d [at p.] 8 . . . .) If the Legislature's intent appears from the language and context of the relevant statutory provisions, then we must effectuate that intent, 'even though the particular statutory language "is contrary to the basic policy of the [workers' compensation law]." ' [Citation.]" (*Kopping v. Workers' Comp. Appeals Bd., supra,* 142 Cal.App.4th at p. 1106.) Because the Legislature's

intent is ascertainable from the language of the new apportionment statutes and the legislative history, we cannot rely on section 3202 to defeat that intent.

### D. *THE BOARD DID NOT ERR IN ITS APPLICATION OF THE CURRENT APPORTIONMENT STATUTES*

Benson argues that even if the Legislature did intend to abrogate *Wilkinson*, the Board nevertheless erred in requiring apportionment on the facts of this case because all of her disability "was caused by *simultaneous* industrial injuries." (Italics added.) We disagree and conclude that the plain language of the apportionment statutes (§§ 4663 & 4664) compels two separate awards here.

■ Benson maintains that section 4663, subdivision (c), does not mandate separate awards because neither of her injuries occurred before, or after, the other. But, as detailed above, the plain language of current sections 4663 and 4664, as well as the Supreme Court's holding in *Brodie*, make clear that apportionment is required for each distinct industrial injury causing a permanent disability, regardless of the temporal occurrence of permanent disability or the injuries themselves. We agree with amicus curiae Zenith that the only relevant inquiry is whether separate and distinct industrial injuries have been sustained.[17] If so, "then each injury must stand on its own."

Because timing is no longer determinative, it is irrelevant that, as Benson contends, a cumulative injury does not "occur" until the cumulative effects of the trauma cause any disability or need for medical treatment.[18] Accordingly, Benson's reliance on *Norton v. Workers' Comp. Appeals Bd.* (1980) 111 Cal.App.3d 618 [169 Cal.Rptr. 33] is misplaced.[19]

In any event, we cannot agree that Benson's two industrial injuries were simultaneous or concurrent. Dr. Izzo never opined that Benson's cumulative injury and specific injury occurred simultaneously. In fact, Dr. Izzo stated his opinion that "50 percent of [Benson's] current permanent partial disability is apportioned to cumulative trauma *through* June 3, 2003," and that "50 percent is apportioned to the specific injury of June 3, 2003." (Italics added.) Dr. Izzo also observed that the cumulative trauma injury represented "degenerative changes in [Benson's] neck that created the spinal stenosis [and]

---

[17] Benson does not argue that her two industrial injuries are not separate and distinct.

[18] For the sake of clarity, we note that inquiring when disability or need for medical treatment manifests is different from inquiring when permanent and stationary status occurs. Benson, however, seems to confuse the two concepts.

[19] Furthermore, *Norton* is distinguishable. The *Norton* court concluded that two cumulative injuries occurred concurrently, rather than, as here, a cumulative injury and a specific injury. (*Norton v. Workers' Comp. Appeals Bd., supra*, 111 Cal.App.3d at pp. 627–629.)

would obviously have to come about *over time*." (Italics added.) Thus, the medical evidence in this case in fact contradicts Benson's theory. Furthermore, section 3208.1 provides, in relevant part: "[a]n injury may be either: (a) 'specific,' *occurring as the result of one incident* or exposure which causes disability or need for medical treatment; or (b) 'cumulative,' *occurring as repetitive mentally or physically traumatic activities extending over a period of time*, the combined effect of which causes any disability or need for medical treatment." (Italics added.) Thus, by definition, cumulative and specific injuries do not occur simultaneously.

It is undisputed that Benson suffered a specific neck injury on June 3, 2003, and a cumulative neck injury through June 3, 2003. The Board properly made no findings regarding the temporal relationship of Benson's injuries because such an inquiry is now irrelevant. We conclude that the Board properly applied the new statutory scheme to require apportionment to Benson's two distinct industrial injuries, each of which caused half of Benson's permanent disability.[20]

### E. *CONCLUSION*

 We hold that the *Wilkinson* doctrine is inconsistent with the apportionment reforms enacted by Senate Bill No. 899. We agree with the Board that a system of apportionment based on causation requires that each distinct industrial injury be separately compensated based on its individual contribution to a permanent disability. We also agree that there may be limited circumstances, not present here, when the evaluating physician cannot parcel out, with reasonable medical probability, the approximate percentages to which each distinct industrial injury causally contributed to the employee's overall permanent disability. In such limited circumstances, when the employer has failed to meet its burden of proof, a combined award of permanent disability may still be justified. (See § 4663, subd. (c); *Kopping v. Workers' Comp. Appeals Bd., supra*, 142 Cal.App.4th at p. 1115 ["the burden of proving apportionment falls on the employer because it is the employer that benefits from apportionment"].)

However, we do not face that situation here. The Board properly made two awards of 31 percent permanent disability each, based on Dr. Izzo's opinion that Benson's permanent partial disability was equally caused by "cumulative trauma *through* June 3, 2003" and "the specific injury of June 3, 2003."

---

[20] Accordingly, we need not consider the argument articulated by Permanente's supporting amici curiae that if Senate Bill No. 899 does not mandate apportionment here, then sections 3208.2 and 5303 do.

## III. DISPOSITION

The Board's opinion and decision after reconsideration is affirmed. The parties shall bear their own costs.

Kline, P. J., and Richman, J., concurred.

Petitioner's petition for review by the Supreme Court was denied April 29, 2009, S171408. Werdegar, J., did not participate therein.